UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| JACK A. SHEETS, | ) |
| --- | --- |
| Plaintiff, | ) |
| v. | ) Case No. 1:14-CV-265 JD |
| INTERRA CREDIT UNION, | ) |
| Defendant. | ) |

## OPINION AND ORDER

### BACKGROUND AND PROCEDURAL HISTORY

Plaintiff Jack A. Sheets (Sheets) filed this lawsuit, which alleges that Defendant Interra Credit Union (Interra) violated the Americans with Disabilities Act by discharging him on account of a perceived disability and disclosing confidential information about him. Sheets also claims that Interra discharged him on account of his age in violation of the Age Discrimination in Employment Act. Interra has filed a motion for summary judgment [DE 47] that seeks judgment in its favor on all of Sheets' claims. Sheets filed a response to that motion [DE 56], to which Interra replied [DE 60].

### STANDARD OF REVIEW

Summary judgment is appropriate when there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Cung Hnin v. TOA (USA), LLC*, 751 F.3d 499, 504 (7th Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). To survive a motion for summary judgment, the party with the burden of proof "must affirmatively demonstrate, by

specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007). Since the Court is evaluating a motion for summary judgment filed by the Defendant, it will construe all disputed facts in the light most favorable to the Plaintiff. *See Anderson*, 477 U.S. at 255 (at the summary judgment stage "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor").

## FACTS

Jack Sheets is the former president and CEO of Interra Credit Union. He worked at Interra from 1976 until his termination in March 2013. Throughout much of his tenure there his relations with employees were positive and uneventful.

In 2007, at the recommendation of the Interra Board of Directors (the Board), Sheets retained Venture International LLC (Venture), a consultancy, to conduct an organizational assessment of Interra.[1] That assessment identified problems throughout Interra's management, including with Sheets. It found that Sheets was knowledgeable and had a sound skill set, but that Interra employees perceived him to be increasingly unapproachable due to hostile and unpredictable behavior. It further concluded that the greatest concern facing the organization was "how the management team, particularly the president, is functioning." [DE 55-4 at 3].

Similar concerns surfaced a few years later. At that time, Sherry Wenger (an Interra employee) met with Interra's director of human resources and several members of the Board. She told the Board that she feared Sheets was creating a hostile work environment.

Shortly thereafter, in January 2011, Sheets suffered a cerebral hemorrhage and began a four month period of medical leave. He had difficulty promptly completing the FMLA

---

[1] At this time Interra was known as Farm Bureau Credit Union. For the sake of simplicity, however, this order will refer to both Farm Bureau Credit Union and Interra as "Interra."

paperwork that Interra required, which frustrated the Board. The Board then reengaged Venture in March 2011 to serve as the Board's liaison in interactions with Sheets. Venture also conducted another organizational assessment of Interra. That assessment concluded in May 2011 and evaluated Sheets less positively than the 2007 assessment.

After Venture's reengagement, Sheets asked the Board's appointed liaison, Venture's Curt Bechler, to also serve as a liaison between himself and his medical staff. To that end, Sheets sent Bechler a signed medical release, but Bechler declined to intermediate between Sheets and his doctors. Bechler subsequently sent Sheets two other medical releases, which Sheets executed and returned.

Sheets returned to work part time in May 2011 and began receiving executive coaching from Venture. He received medical clearance to return to work in August 2011, completed executive coaching with a positive review and was restored to the office of president and CEO without restriction in September 2011.

In early 2012, Sheets received positive evaluations. The Board deemed numerous areas of his performance to be excellent and outstanding, though noted some areas for potential improvement. It also gave Sheets the largest raise he had ever received. Venture conducted an assessment of Sheets too, which was also positive.

Additionally, Venture drafted a report which recommended additional evaluations of Sheets, but Sheets declined to engage Venture for that purpose. [DE 55-38 at 3, ¶ 3]. Venture then explained to the Board that it believed Interra's management and CEO required some kind of continuing support system. In support of this conclusion, it pointed to risks that the CEO and management team might revert to "prior ways of functioning," Sheets' ongoing cognitive recovery and the importance of succession planning due to Sheets approaching retirement age.

[DE 55-38 at 3]. Venture stopped providing managerial consulting services to Interra in July 2012 (though continued to monitor its compliance line).

In May 2012 Bechler sent an email to David Birky, a member of Interra management, which referenced Sheets as having a "cognitive injur[y]." [DE 55-39]. A few months later, in August 2012, Birky called Interra's compliance hotline and voiced concerns regarding Sheets' impaired cognition and inability to focus. Birky also said that some of his peers in the credit union industry had told him that Sheets was not fit for leadership and was, at some level, an embarrassment to the credit union.

In November 2012, Birky sent a signed memorandum to Board Chairman Steve Warner (Warner), reiterating concerns regarding Sheets' leadership. He noted, *inter alia*, that Sheets had an "inability to understand what it means to think strategically" and "often functions as if he is lost." [DE 55-50 at 1]. In December 2012, Rex Hochstedler—another member of Interra management—also drafted a memorandum to Warner. Hochstedler expressed concerns with Sheets' leadership and indicated that Sheets had "been difficult to work with and has had a difficult time understanding things." [DE 49-57 at 1]. In a December 2012 executive committee meeting, Warner and Board Secretary Linda Garber (Garber) noted that "they had received further comments from senior Interra staff suggesting growing frustration with the CEO." [DE 55-48 at 2]. The Board then met in a January 2013 executive session and decided to replace Sheets. Board members cited a variety of problems with Sheets' performance, including his alleged inability to focus, in reaching that decision. After discussions between the Board and Sheets, Sheets was terminated in March 2013.

**ANALYSIS**

1.  Motions to Strike

Prior to addressing the Defendant's motion for summary judgment, it is necessary to resolve the parties' motions to strike. Both Sheets and Interra have filed motions which contest the admissibility of evidence under Fed. R. Civ. P. 56(c). Those motions present "threshold question[s] because a court may consider only admissible evidence in assessing a motion for summary judgment." *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). The decision to grant or deny a motion to strike is within the discretion of the trial court. *Stinnett v. Iron Works Gym/Executive Health Spa, Inc.*, 301 F.3d 610, 613 (7th Cir. 2002).

    *A. Interra's Motion to Strike Sheets' Surreply*

Interra first seeks to strike Sheets' surreply. It argues Sheets did not seek leave of court for this filing and that such leave was necessary since surreplies are not explicitly permitted by Northern District of Indiana Local Rule 56-1. While Interra is correct that this Court's rules do not expressly permit surreplies, they do not categorically bar them either. *See Merril Lynch Life Ins. Co. v. Lincoln Nat. Life Ins. Co.*, No. 2-09-CV-158, 2009 WL 3762974, at *1 (N.D. Ind. Nov. 9, 2009). "Rather, a surreply brief is occasionally allowed when it raises or responds to some new issue or development in the law." *Id.* (alteration and internal quotation marks omitted). In this case, Interra filed a "Supplemental Appendix and Statement of Additional Material Facts." [DE 61]. The Court finds that it was permissible for Sheets to respond to that supplemental filing to identify the material facts in it that he disputed. Further, while Sheets' counsel ought to have sought leave prior to responding to Interra's filing, the Court will not disregard Sheets' surreply on that technicality. Accordingly, the Defendant's motion to strike [DE 65] Sheets' surreply [DE 64] is denied.

5

*B. Interra's Motion to Strike Portions of Sheets' Affidavit and Certain of Sheets' Exhibits*

Interra also seeks to strike portions of Sheets' affidavit and certain exhibits that he submitted. As to the affidavit, Interra contends that paragraphs 9, 10 and 12 contain inadmissible hearsay statements from Curt Bechler. Sheets responds that those statements are not hearsay since they are opposing party statements under Rule 801(d)(2)(A).

While Sheets argues for the admissibility of Bechler's statements under Federal Rule of Evidence 801(d)(2)(A)—which provides for the admission of statements made by a party in a representative capacity—another subsection of 801(d)(2) is more applicable. Rule 801(d)(2)(C) provides for the admission of statements "made by a person whom the party authorized to make a statement on the subject." Sheets provides evidence that the Board engaged Bechler "to serve as [its] liaison and spokesman" in interacting with Sheets. [DE 55-11 at 1]. Regardless of whether this indicates that the Board authorized Bechler to serve as its representative, it clearly indicates that the Board authorized Bechler to make statements on its behalf as to Sheets' return to work. That makes Bechler's statements to Sheets admissible as non-hearsay. Fed. R. Evid. 801(d)(2)(C); *see also Michaels v. Michaels*, 767 F.2d 1185, 1201 (7th Cir. 1985).

But that does not resolve one portion of Sheets' affidavit, which contains double hearsay. In paragraph 12, Sheets says Bechler told him that Sheets' physician, Dr. Wendell Rohrer, said Sheets had a deficit in his mental flexibility. While Bechler's statement is non-hearsay under Rule 801(d)(2)(C), no hearsay exception appears applicable to Rohrer's statement[2] and Sheets does not propose one. Accordingly, the Court strikes Rohrer's statement. *See Jordan v. Binns*,

---

[2] The hearsay exception for statements made for medical diagnosis or treatment, Fed. R. Evid. 803(4), does not apply here. It "does not purport to except, nor can it reasonably be interpreted as excepting, statements by the person providing the medical attention to the patient." *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 564 (7th Cir. 1996).

6

712 F.3d 1123, 1129 (7th Cir. 2013) (noting that courts have applied Federal Rule of Evidence 805 "to hold that an admission repeating another's statement is admissible only if the other person's statement is itself an admission or falls within an exception to the hearsay rule."). So, Interra's motion to strike [DE 62] portions of Sheets' affidavit [DE 55-37] is granted as to Rohrer's statement in paragraph 12 of that affidavit ("According to Dr. Bechler, Dr. Rohrer told him that I had a deficit in my 'mental flexibility.'"), but otherwise denied.

Interra next challenges the authenticity of several of Sheets' exhibits: [DE 55-24]; [DE55-27]; [DE 55-39]; [DE 55-40]; [DE 55-43]; [DE 55-44]; [DE 55-45] and [DE 55-46]. Under Rule 901, a proponent of evidence must "produce evidence sufficient to support a finding that the item is what the proponent claims it is." All of the documents at issue here are allegedly from Venture. Sheets' counsel claims in an affidavit, and Interra does not refute, that Venture produced all of those documents in state court litigation related to this case. If that is correct, it would be reasonable to conclude that they are Venture's authentic documents. *See Int'l Paper Co. v. Androscoggin Energy LLC*, No. 00 C 6215, 2002 WL 31155069, at *2 (N.D. Ill. Sept. 26, 2002). Accordingly, the Court finds that Sheets has produced sufficient evidence to support a finding of authenticity under Rule 901 and Interra's motion to strike [DE 62] is denied as to Sheets' exhibits.

### C. Sheets' Motions to Strike

Finally, Sheets filed two motions to strike. [DE 54]; [DE 53]. One of those challenges certain portions of the depositions of Andrew Gangwer [DE 49-1] and Sanford Miller [DE 49-2]. The other challenges portions of the affidavit of Ruth Pletcher [DE 49-19]. The Court need not rule on these, however, because it determines that summary judgment for the Defendant is appropriate even without considering this contested evidence. *See Scottsdale Ins. Co. v. Knapp*,

7

No. 13 C 988, 2015 WL 2012433, at *2 (N.D. Ill. Apr. 30, 2015). Accordingly, the Court turns to analyzing the Defendant's summary judgment motion.

2.  ADA Termination Claim

Sheets claims that Interra terminated him in violation of the ADA. In his brief he cites the elements required to establish an ADA violation via a direct method of proof and addresses none of the burden-shifting factors under the indirect method. So, it would appear that he is proceeding via the direct method. To avoid summary judgment on such a claim, Sheets must demonstrate a genuine issue of material fact as to: (1) whether he is disabled, (2) whether he was qualified to perform the essential functions of his job and (3) whether he was terminated because of his disability (i.e. whether his disability was a but for cause of termination). *Povey v. City of Jeffersonville, Ind.*, 697 F.3d 619, 622 (7th Cir. 2012).

*A. Disability*

The ADA defines a "disability" as "(a) a physical or mental impairment that substantially limits one or more major life activities of such individual; (b) a record of such impairment; or (c) being regarded as having such an impairment." *Silk v. Bd. of Trustees, Moraine Valley Cmty. Coll., Dist. No. 524*, 795 F.3d 698, 706 (7th Cir. 2015) (citing 42 U.S.C. § 12102(1)). Sheets brings his claim under prong (c). That requires him to show that Interra "perceived him as having an impairment, 'whether or not the impairment limits or is perceived to limit a major life activity.'" *Id*. (quoting 42 U.S.C. § 12102(3)(A)). Sheets claims that Interra regarded him as "having an impairment to his ability to think, focus and understand." [DE 56 at 1].

A reasonable juror could conclude that to be true. Interra's Board knew that Sheets had suffered a brain hemorrhage. *See, e.g.*, [DE 49-39 at 2]. Moreover, the Board received several indications that Sheets had cognitive issues. For example, Venture drafted a report to the Board

8

in April 2012 that indicated that the CEO had faced "serious medical issues" and described his cognitive recovery as an "ongoing process." [DE 55-38 at 3]. Sheets also asserts that Bechler shared an email with Warner in May 2012, in which Bechler referred to Sheets as having a "brain illness." [DE 55-41 at 1]. Moreover, according to Sheets, "beginning in mid-April and continuing to mid-December 2012, the Board was being told repeatedly by Bechler, Birky, and Hochstedler in emails, reports, memoranda, and a hotline call, that Sheets had a cognitive injury that was impairing his ability to focus and understand." [DE 57 at 13]. So, Sheets has presented evidence that the Board may have regarded him as disabled.

Interra contends that it is not enough for Sheets to show that Interra regarded him as having a disability. Rather, he must demonstrate that Interra regarded him as possessing a disability that substantially limited his ability to perform a major life activity. But that was the standard under a prior version of the ADA. Since Congress amended the ADA in 2008, a mere perception of impairment is sufficient to support a regarded as claim.[3] *Silk*, 795 F.3d at 706. An "employer need not believe that the plaintiff is substantially limited in a major life activity." *Stragapede v. City of Evanston*, 69 F. Supp. 3d 856, 862 n. 3 (N.D. Ill. 2014). The above-described evidence would permit a reasonable juror to conclude that Interra perceived Sheets as having impaired cognitive functioning. Accordingly, Sheets has presented evidence that would permit a reasonable juror to find in his favor on the first element of his claim.

---

[3] There is an exception as to "transitory and minor" impairments. 42 U.S.C. § 12102(3)(B). But Interra does not contend that Sheets' impairment was transitory and minor and it had the burden to raise that argument if it wished to pursue it. *Silk*, 795 F.3d at 706.

### B. *Essential Functions of Employment*

To recover, Sheets must also show that he was qualified to perform the essential functions of his position. *See Dyke v. O'Neal Steel, Inc.*, 327 F.3d 628, 634 (7th Cir. 2003); *Stragapede*, 69 F. Supp. 3d at 861. He argues that he was, citing numerous signs of his positive performance in late 2011 and early 2012. These include: First, a positive evaluation from Venture in September 2011. [DE 55-27]. Second, an observation from John Yordy of Venture in a November 2011 email to Warner (among others) that Sheets had a "continued commitment to new ways of leading." [DE 55-30]. Third, Board minutes from December 12, 2011, in which "[m]any Board Members noted that they were pleasantly surprised by the change that they had seen in President Sheets." [DE 55-31 at 1]. Fourth, Sheets' strong April 2012 performance evaluations. [DE 55-34]; [DE 55-35]; [DE 55-36]. Fifth, the $25,000 pay increase that Sheets received in or around April 2012. [DE 55-36 at 1]; [DE 55-37 at 5]. And, sixth, the Board's decision to gift Sheets White Sox tickets in August 2012. [DE 55-42].

But while this evidence may be probative of Sheets' performance from late 2011 to mid-2012, the Court examines whether Sheets was qualified to perform the essential functions of his position *at the time he was terminated*. *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 287 (7th Cir. 2015). Accordingly, positive performance assessments that precede termination by several months and are followed by uncontested evidence of performance failings are insufficient to demonstrate that an employee was meeting his employer's expectations at the time of termination. *Id.*

That is the case here. While Sheets has designated evidence that he performed well until August 2012, the evidence also indicates that his performance deteriorated significantly from August 2012 until his termination. First, on August 18, 2012—two days after the Board decided

10

to award Sheets White Sox tickets—Birky called Venture's compliance hotline and voiced concerns as to Sheets' cognitive abilities and fitness to lead the credit union. [DE 55-43]. Venture believed that this call was "legitimate" and raised serious issues. [DE 55-45]. Second, according to the testimony of Board members Brewton and Rupp, Sheets was disorganized and unprepared at Interra's annual planning conference in September 2012 and did not interact well with senior management team members there. [DE 49-24 at 11-12]; [DE 49-43 at 10-11]. Third, Birky and Hochstedler sent memoranda to Warner in November 2012 and December 2012, respectively, which detailed concerns about Sheets, including his purportedly impaired comprehension. [DE 55-50]; [DE 49-57]. Fourth, in December 2012 Sheets told the Board that communication, camaraderie and participation had not increased among the senior management team. [DE 49-48 at 2]. Fifth, Warner testified that Sheets did not appropriately respond to the Board's request for information on his progress towards meeting his goals and objectives in January 2013. [DE 49-18 at 48-50]. Sixth, members of the Board noted numerous issues with Sheets' performance—such as poor time management and a lack of focus and preparation—at the meeting where they decided to terminate him. [DE 55-49].

Sheets does not contest the bulk of this evidence. He points to Board member David Myers' testimony that Myers could not recall "anyone other than the hotline caller" (Birky) bringing negative information to the Board about Sheets from April 2012 to January 2013. [DE

55-51 at 5]).[4] That could raise a fact question as to Hochstedler's memorandum.[5] But, Myers' testimony does nothing to refute Birky's complaints, Sheets' own testimony or the issues with Sheets' performance that the Board observed directly. And in any event, Sheets directly concedes that the Board received many adverse indications of his performance before he was terminated. [DE 57 at 13] ("After all, beginning in mid-April and continuing to mid-December, 2012, the Board was being told repeatedly by Bechler, Birky, and Hochstedler in emails, reports, memoranda, and a hotline call, that Sheets had a cognitive injury that was impairing his ability to focus and understand."). So, Interra has provided substantial, uncontested evidence that Sheets was not qualified to perform the essential functions of his position at the time he was terminated. Sheets' failure to oppose that evidence precludes a reasonable juror from finding in his favor. *See Dyke*, 327 F.3d at 634 (affirming grant of summary judgment where a plaintiff—who had impaired vision which did not rise to the level of an actual disability[6] but caused his employer to regard him as disabled—did not present evidence he could perform the essential functions of his job).

While Sheets argues only that he was regarded as disabled, he would not prevail even if his performance issues were attributable to an actual disability. The Seventh Circuit has made

---

[4] Sheets also cites Human Resources Manager Rhonda Eslinger's testimony for a similar proposition: "There was only a single call to the compliance hotline – David Birky's and there were no other complaints from rank and file employees brought to the Board [between January 2011 and March 2013], according to H.R. Manager Rhonda Eslinger. [Attach. 52]." [DE 57 at 11]. But, in [DE 55-52], Eslinger testified only that she did not personally observe or receive a complaint as to bullying, abuse or mistreatment of another employee by Sheets between Sheets' return from medical leave and his termination. That does not refute that the Board may have received complaints about Sheets from sources other than Eslinger. It also does not contradict any of the above-referenced evidence.

[5] Even this is not necessarily true, since Hochstedler addressed his memorandum to Warner, not the Board. So, it is possible that Warner received Hochstedler's complaint, but did not share it with the Board.

[6] The Court uses "actual disability" to refer to a disability under 42 U.S.C. § 12102(1)(A) or (B), which provide that an individual is disabled if he or she has a physical or mental impairment that substantially limits one or more major life activities or a record of such impairment. In contrast, 42 U.S.C. § 12102(1)(C) provides for a finding of disability if an individual is regarded as having such an impairment.

clear that disability-imposed limitations are pertinent to the essential functions calculus. For example, in *Stern v. St. Anthony's Health Center*, a psychologist for an acute-care facility sued his employer after he was discharged. 788 F.3d 276. The Seventh Circuit affirmed summary judgment for the employer. It found that the plaintiff had failed to present evidence that he could perform the essential functions of his employment in light of a record that indicated he suffered from impaired cognition and memory loss. *Id*. at 294-95. Similarly, in *Basden v. Professional Transportation, Inc.*, the Seventh Circuit found that a Plaintiff who suffered from multiple sclerosis had failed to put forward evidence that she would be able to return to work on a regular basis. 714 F.3d 1034, 1038 (7th Cir. 2013). That foreclosed her claim, since a "plaintiff whose disability prevents her from coming to work regularly cannot perform the essential functions of her job, and thus cannot be a qualified individual for ADA purposes." *Id.* at 1037. So, even if Sheets had an actual disability, he would still fall short on the second element of his claim.

Finally, the Court notes that Sheets does not contend that he would have been able to perform the essential functions of his employment with the benefit of reasonable accommodations. The onus was on him to make that argument if he wished to do so. *See id.* ("In response to an employer's motion for summary judgment, it is the plaintiff's burden to produce evidence sufficient to permit a jury to conclude that she would have been able to perform the essential functions of her job with a reasonable accommodation."). Further, it is unclear whether such an argument would even be available to Sheets in light of the 2008 amendments to the ADA, which provide that employers need not provide reasonable accommodations to individuals that are only "regarded as" disabled. 42 U.S.C. § 12201(h); *see also Majors v. General Elec. Co*, 714 F.3d 527, 535 n. 4 (7th Cir. 2013); *Powers v. USF Holland, Inc.*, 667 F.3d 815, 823 n.7 (7th Cir. 2011). Accordingly, the Court finds that Sheets

13

has not made the necessary showing to survive summary judgment on the second element of his claim.

   *C. Causation*

While that bars Sheets' recovery, the third element of his claim nevertheless merits brief discussion. It requires Sheets to show that his disability (whether real or perceived) "was a 'but for' cause of his termination, which can be demonstrated through direct or circumstantial evidence, with circumstantial evidence encompassing, among other things, suspicious timing and pretext for the adverse employment action."[7] *Hooper v. Proctor Health Care Inc.*, 804 F.3d 846, 853 (7th Cir. 2015) (citation omitted).

Sheets provides direct evidence to link his termination to a perception of disability. The Board minutes from the meeting in which the Board voted to terminate Sheets contain numerous references that could be reasonably understood to refer to issues with Sheets' cognition. [DE 55-49 at 1-2] ("[Board member] Eash commented that President Sheets does not focus and stay on the subject at hand . . . [Board member Brewton] indicated that she feels President Sheets does not focus on the subject at hand and many times does not answer or address the question at issue . . . [Board member Yoder] noted that . . . many times he hears a lot from the President but does not know that the President has really provided anything of substance."). Interra responds that it did not terminate Sheets on account of his disability, but rather due to an unrelated history of poor performance. It points to justifications the Board provided at the termination meeting, which Interra claims are unrelated to a perception of disability, like Sheets' purported inability to

---

[7] The Seventh Circuit has not yet addressed "whether the 2008 amendments to the ADA, which changed the statutory language from prohibiting discrimination "because of" a disability to prohibiting discrimination "on the basis of" a disability, affects the standard required to prove causation." *Hooper*, 2015 WL 6445494, at *7 n. 2. Since the parties have not raised that issue, this Court will not address it either.

14

work well with other members of management. *See, e.g.*, [DE 60 at 13-14]; [DE 49-60].

It is true that the Board appears to have had numerous reasons for discharging Sheets, some apparently related to concerns with Sheets' cognition and some not. It is not entirely clear which of those caused Sheets' termination. But, that simply means that there are multiple reasonable explanations as to why the Board terminated Sheets. Disentangling the numerous factors that the Board considered in its decision (and determining which of those were causal factors and which were not) would have been a task for a jury. Sheets' failure to present evidence to substantiate the second element of his ADA termination claim, however, forecloses his recovery.

3. ADA Disclosure Claim

Sheets also asserts that Interra (by way of Venture) disclosed his confidential medical information in violation of 42 U.S.C. § 12112(d)(3)(B) and § 12112(d)(3)(C) of the ADA. To state a claim for violation of the ADA's confidentiality provisions, a plaintiff must allege that: (1) his employer obtained his medical information through employment-related medical examinations and inquiries, (2) the information obtained through such means was disclosed by the employer rather than treated as confidential (unless that information falls under one of the exceptions found in 42 U.S.C. § 12112(d)(3)(B)(i), (ii), (iii), which are not at issue here) and (3) he suffered a tangible injury as a result of the disclosure. *Shoun v. Best Formed Plastics, Inc.*, 28 F. Supp. 3d 786, 788-89 (N.D. Ind. 2014). Under the first prong of this analysis, an employer only has an obligation to maintain the confidentiality of information if it was obtained via an employment-related medical examination or a job-related inquiry regarding an employee's medical health. *See E.E.O.C. v. Thrivent Fin. for Lutherans*, 700 F.3d 1044, 1050 (7th Cir. 2012); 42 U.S.C. § 12112(d). In contrast, information that is voluntarily disclosed by an

employee is not protected by 42 U.S.C. § 12112(d). *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1047 (10th Cir. 2011); *Cash v. Smith*, 231 F.3d 1301, 1307 (11th Cir. 2000); *Taylor v. City of Shreveport*, 798 F.3d 276, 288 (5th Cir. 2015).

Sheets claims that Venture's Curt Bechler violated the ADA by sending David Birky, an Interra manager subordinate to Sheets, an email on May 3, 2012, which referenced Sheets as having a cognitive injury:

> As to Jack, I have no doubt that you are direct [sic]. I would encourage you to keep pushing both individually and as a team on those communication issues. These are long ingrained patterns and they only change with ongoing awareness and accountability. Cognitive injuries can also make change all the more difficult. Board, CEO, and management team have to factor in both the pattern and the injury into the equation when it comes to working at change.

[DE 55-39]. Interra responds that this claim should fail, since Sheets voluntarily disclosed that he had suffered a cognitive injury to Bechler. As such, it says, Bechler had no obligation to preserve the confidentiality of that information under the ADA. Sheets disagrees, asserting that Bechler learned of Sheets' cognitive injury through a medical release that he solicited from Sheets, not via a voluntary disclosure.

The uncontested evidence demonstrates that Sheets voluntarily disclosed his cognitive injury to Bechler. Sheets concedes that he executed a medical release on his own initiative on April 14, 2011, which permitted Bechler to access his work-related records at Elkhart General Hospital. [DE 61-3 at 21]. But this, he says, was to facilitate Bechler serving as an intermediary between Sheets and his medical team. After Bechler declined to serve in that capacity, Sheets then executed a second release[8] (which also permitted Bechler to access his work-related records at Elkhart General Hospital) on April 20, 2011. [DE 64-1 at 5-6]. According to Sheets, it was

---

[8] Sheets also signed a third release on May 10, 2011 that permitted Bechler to meet with Dr. Jon Markley, another of his physicians. That is not relevant here, given Sheets' allegation that Bechler learned Sheets had a cognitive injury in an April 27, 2011 conversation with Rohrer.

16

this second release that Bechler used to meet with Dr. Rohrer, Sheets' treating neuropsychologist, on April 27, 2011 to learn of Sheets' cognitive injury. [DE 56 at 1].

But even assuming that Bechler relied exclusively on the second release to meet with Rohrer, the undisputed facts indicate that release arose from Sheets' desire for Bechler to meet with his physicians. In an April 17, 2011 email, Sheets provided information about his physicians to Bechler. Bechler then responded that he had received word "approving *your* [i.e. Sheets'] request for my having discussions with your team . . . I will be sending you a formal release form[.]" [DE 64-1 at 9] (emphasis added). The second release also explicitly states that it was prepared at Sheets' request. [DE 64-1 at 5] ("This authorization is initiated 'at the request of the individual.'"). So, while Bechler may have ultimately asked Sheets to sign the second release, [DE 55-37 at 3-4], uncontroverted evidence indicates that he did so to effectuate Sheets' request.

Finally, even if Bechler had solicited the second release from Sheets, Sheets volunteered information to Bechler that indicated he suffered a cognitive injury in an April 14, 2011 email—before Bechler ever met with Rohrer. *See, e.g.*, [DE 61-3 at 16] ("the clinical neuropsychology doctor said that he had a concern about my reentry because of what he called mental flexibility, or lack thereof"); [DE 61-3 at 20] ("my rehabilitation timeline is viewed similar to a stroke victim."). Accordingly, Sheets voluntarily disclosed to Bechler that he suffered a cognitive injury. As such, Bechler had no obligation to hold that information in confidence under the ADA and Sheets' ADA disclosure claim fails.

4. ADEA Claim

That leaves Sheets' claim under the ADEA. Since he does not so much as mention that claim in his briefing, the Court need not consider it. *See, e.g., Packer*, 800 F.3d at 852 (7th Cir.

2015) (finding cursory defense of a claim on summary judgment to result in waiver); *see also Palmer v. Marion Cnty.*, 327 F.3d 588, 597 (7th Cir. 2003) (finding waiver of negligence claim that was pled, but not raised before the district court or the court of appeals). Furthermore, at summary judgment an ADEA plaintiff must demonstrate the existence of a genuine issue as to whether the employer discriminated against him on the basis of age. *Guinto v. Exelon Generation Co., LLC*, 341 F. App'x 240, 245 (7th Cir. 2009). Sheets has provided no evidence to this effect, thus precluding a reasonable juror from finding in his favor.

## CONCLUSION

For the foregoing reasons, the Defendant's motion to strike Sheets' surreply [DE 65] is DENIED. The Defendant's motion to strike portions of Sheets' affidavit and certain of Sheets' exhibits [DE 62] is GRANTED IN PART consistent with the above analysis and otherwise DENIED. The Plaintiff's motions to strike [DE 53]; [DE 54] are DENIED as moot. The Court GRANTS the Defendant's motion for summary judgment [DE 47] and DIRECTS the Clerk to enter judgment for Interra Credit Union against Jack Sheets.

SO ORDERED.

ENTERED: January 29, 2016

/s/ JON E. DEGUILIO
Judge
United States District Court